NicholsoN, C. J.,
delivered the opinion of the court»
In the spring of 1861, a stranger put up at the Lamar House in Knoxville, then kept by William Kirk. His ostensible business was to look after certain mineral interests. At the end of two or three weeks, he applied to Kirk for the loan of $250, which he needed in prosecuting a journey further south. By way of indemnity, he offered to pledge with Kirk a bond for $1,000 on the Camden and Amboy Railroad Company, with coupons for one year’s interest then due. After consulting complainant Sneed, and learning that the bond was negotiable, and then consulting defendant Samuel Morrow, and *447 learning that its market value was nearly at par. Kirk advanced to the stranger all the money he then had, which was $238 in gold and silver, and received the bond with the understanding that if it was not redeemed in three weeks, the bond was to be the property of Kirk.
Before the three weeks expired the stranger (whose name is not remembered by Kirk) addressed a letter to him, dated at Vicksburg, stating that he had been delayed in his trip; that he was about taking a steamer for New Orleans, but that he would be in Knoxville in a few days.
Kirk waited a reasonable time, and hearing nothing more from the stranger, he considered the bond his own property. He concluded soon afterwards to cut off a coupon from the bond and send it to the northern cities for collection. Accordingly, he placed a coupon in the hands of a friend going north, who, upon his return, handed the coupon back to Kirk, stating that he had heard that the bond had been stolen from some treasury, and for that reason he did not attempt to collect it.
Upon receiving this information, Kirk went to the Morrow’s for advice, at which time Samuel Morrow alleged that the actions of the stranger while in Knox-vile had been suspicious. He also stated in his answer that he suggested to Kirk before' he took the bond that the circumstances were suspicious, but Kirk, in his answer to the cross-bill, denies this statement of Samuel Morrow.
At the time Kirk consulted the Morrow’s, he states *448 that Robert Morrow urged that even if the bond was stolen, Kirk had bought it without notice, and then proffered that he would take the bond and collect it, whether it had been stolen or not.
In a short time afterwards Kirk handed the bond for collection to Robert Morrow, who was starting to the north, and upon reaching Baltimore he wrote back to Samuel Morrow, requesting him to get Kirk’s power of attorney, authorizing a sale of the bond. This was procured and sent to Robert Morrow, who went to Philadelphia and placed the bond and coupon in the hands of two attorneys at law there for collection. Suit was brought on the coupon, but Robert Morrow soon afterwards dispatched to them from New York to express to him the bond, and dismiss the suit. On the 5th of April, 1861, the attorneys wrote to Robert. Morrow at New York, that they had that day expressed to him the bond, but said, “ the coupon is in suit, we will withdraw it to-morrow. Mr. Lardner, the owner of the bond, lives here and called on us. He has knowledge where nine of the bonds are. The road has been enjoined here, by our Court of Common Pleas, from paying the coupons, or recognizing the bond. The chief of the New York police wrote to Mr. Lardner to go to New York. He seemed indisposed to do so, and indifferent as to the thief.”
Not long afterwards, Robert Morrow returned to Knoxville, but did not bring the bond back with him, saying that he had left it with some gentlemen in New York, but with whom does not appear. Soon *449 after his return home, Robert Morrow became non compos mentis, and not long afterwards died. What became of the bond does not appear.
In the latter part of 1861, complainant Sneed received a transfer of the claim of Kirk for the bond, as collateral security for a debt owing from Kirk to him. The bill was filed by Kirk and Sneed to make Wm. Morrow, the administrator of Robert Morrow, responsible for the value of the bond.
The facts stated were developed in the original and cross-bills, and the answers thereto. The Chancellor rendered a decree against the administrator of Robert Morrow, and ordered an account to ascertain the value of the bond and interest. From this decree the administrator has appealed.
No doubt can exist as to the fact that the bond was stolen property when it was pledged to Kirk, but while the circumstances were such as to excite suspicion, it appears that Kirk either had none, or if he had, that he was not so strongly impressed by the suspicious conduct of the stranger as to restrain him from going into so tempting a speculation. But whether or not he became a holder of the bond as an innocent purchaser for value, need not be inquired into in this suit, as the railroad company which issued the bond is not the party sued. The question here is between Kirk, the holder of the bond, and Robert Morrow, his agent for its sale or collection. As stated by Kirk, the complainant, when he handed the bond to Morrow to be carried north for sale or collection, he had positive information that the bond *450 was understood to be stolen property. He bad sent a coupon ' north for collection, and it had been returned to him, with the information that the bond was understood to have been stolen. Upon receiving this information he enters into an arrangement with Morrow, who was apprized of the information Kirk had received, to take the bond north for sale or collection. The court of equity is invoked by Kirk to aid him in compelling Morrow to account to him for the value of a bond, which both parties had reason to believe was stolen property. The statement of the proposition at once repels both Kirk and Morrow from a court of equity: Adams’ Eq., 45. Parties can not involve themselves in such illegal transactions and then expect to have the aid of this court in settling the equities between them: Adams Eq., 45.
Both bills are dismissed. Complainants in the original bill will pay the costs of that bill, and complainant in the cross bill the costs of that.